J-S64024-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DUANE LEE FREY | |
| Appellant | No. 169 MDA 2015 |

Appeal from the PCRA Order of December 31, 2014
In the Court of Common Pleas of York County
Criminal Division at Nos.:     CP-67-CR-0001293-2003
                               CP-67-CR-0005052-2002

BEFORE:  FORD ELLIOTT, P.J.E., WECHT, J., and FITZGERALD, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 16, 2015**

Duane Lee Frey appeals the denial of his third petition for relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541-46, after an evidentiary hearing.  We affirm.

On April 25, 2003, following a jury trial, Frey was convicted of first-degree murder, 18 Pa.C.S. § 2502(a), arson, 18 Pa.C.S. § 3301, tampering with physical evidence, 18 Pa.C.S. § 4910, and receiving stolen property, 18 Pa.C.S. § 3925.  In an earlier appeal, a panel of this Court summarized the facts offered by the Commonwealth in support of Frey's convictions as follows:

_____

[*]     Former Justice specially assigned to the Superior Court.

On May 25, 2002, Hopethan Johnson bought a motorcycle. At some point, he left the motorcycle in a garage belonging to a man named Stacey Farmer.

On May 26, 2002, at roughly 11:30 a.m., a neighbor of Stacey Farmer reported to police that she had heard approximately five gunshots in the woods behind Farmer's home. Upon investigating, police found nothing unusual, but did notice a truck registered to Frey in Farmer's driveway.

In June 2002, police received an anonymous tip that a murder had happened near Farmer's residence. During the ensuing investigation, police found shotgun wads in the woods behind Farmer's house. Also found near Farmer's home was a garbage bag containing, *inter alia*, Johnson's cell phone. Police found shotgun shells in Frey's house and car. Additionally, police located Johnson's motorcycle hidden under a pile of items near Frey's place of employment. Embedded in parts of the motorcycle were shotgun pellets.

Although Johnson's body had not yet been found, Frey was eventually arrested in connection with Johnson's death. Frey later admitted to the killing[, telling the police that he dumped Johnson's body in the Susquehanna River.]

There are at least some indications in the record that police also suspected Farmer was connected, directly or indirectly, to Johnson's death. It appears police charged him with, *inter alia*, tampering with evidence in connection with the homicide. The allegations against Farmer seem to have included the claim that he lied to police by giving false or incomplete information in one way or another as to what he knew about Johnson's demise. It also appears police believed Farmer had helped Frey hide Johnson's motorcycle.

While Frey was in custody for Johnson's murder, Farmer was shot dead in his driveway. At some point, police questioned Frey in connection with Farmer's death. Although the reasons are not entirely clear to us, it seems that Farmer's manner of death was not determined to be homicide until 2010.

There are indications in the record that, prior to the homicides in question, Johnson, Farmer, and Frey had all been connected by drug activity. More particularly, it may be that Johnson sold drugs from Farmer's residence and Frey bought drugs from Johnson.

- 2 -

***Commonwealth v. Frey***, 41 A.3d 605, 607-08 (Pa. Super. 2012).[1]

At the conclusion of trial, Frey was convicted of the crimes set forth above. The trial court sentenced Frey to, *inter alia*, life imprisonment on the first-degree murder charge. On January 21, 2005, a panel of this Court affirmed Frey's judgment of sentence. ***Id.*** at 1. Frey sought allowance of appeal with our Supreme Court, which the Court denied on December 20, 2005. ***See Commonwealth v. Frey***, 890 A.2d 1056 (Pa. 2005) (*per curiam*).

On August 7, 2006, Frey filed a timely first PCRA petition, which the PCRA court denied after an evidentiary hearing. On April 27, 2010, a panel of this Court affirmed the PCRA court's order. ***See Commonwealth v. Frey***, No. 1843 MDA 2008 (Pa. Super. Apr. 27, 2010). Once more, Frey filed a petition for allowance of appeal with the Pennsylvania Supreme Court, and, again, the Court denied the petition. ***Commonwealth v. Frey***, 8 A.3d 341 (Pa. 2010) (*per curiam*).

Another panel of this Court, in a published opinion, summarized the subsequent events that led to the instant appeal:

> Sometime in 2008, certain skeletal remains were found near the Susquehanna River. Also in 2008, the Commonwealth obtained

---

[1] As noted, Frey also was convicted of arson. The record reveals that Johnson borrowed a vehicle from Stephanie Summers. That vehicle was later found in Harrisburg destroyed by fire. Police later determined that Frey had driven the car to Harrisburg and intentionally set it ablaze. This was the factual basis for the arson charge.

a forensic report relating to the skeleton. Thereafter, apparently in 2010, the Commonwealth secured DNA testing that identified the remains as being those of Johnson.

On or after May 27, 2010, the Commonwealth mailed Frey and his counsel a letter indicating [that] Johnson's skeletal remains had been discovered. It appears [that] the Commonwealth provided Frey a copy of the 2008 forensic report on or about June 8, 2010.

On or about July 30, 2010, Frey filed for relief under the PCRA. His petition essentially sought a new trial based on after-discovered evidence—specifically, Johnson's remains and the forensic report relating thereto. Part of Frey's allegations was that the forensic report indicated Johnson's death may have occurred between six months and several years prior to the report. Frey essentially contended this new evidence cast doubt on the question of whether Johnson was killed in 2002, as the Commonwealth maintained during Frey's trial.

Additionally, Frey alleged that the forensic report contained information indicating there were multiple sizes of shotgun pellets found in Johnson's skeleton. It was Frey's position that the information concerning the pellet sizes could reasonably suggest the existence of multiple shooters, thereby casting doubt on the Commonwealth's theory that Frey had been the only principal killer.

On or about October 29, 2010, Frey supplemented his PCRA petition, alleging that police first determined in 2010 that Farmer's death was a homicide. Subsequently, in PCRA proceeding convened by the court, Frey essentially took the position that Johnson's killer or an accomplice thereto may have killed Farmer, perhaps because the common killer feared Farmer was going to reveal facts which he knew about Farmer's death.

In March 2011, Frey filed a motion for discovery. More particularly, he sought discovery of police and ballistic reports, eyewitness statements, photographs, and autopsy reports regarding the death of Stacey Farmer. Frey contended the requested information could demonstrate similarities between the murders of Farmer and Johnson, possibly evidencing a common shooter. Because Frey was incarcerated at the time, Frey's position was that proving a shooter common to both Farmer and Johnson could cast doubt on the Commonwealth's theory that Frey shot Johnson.

- 4 -

The PCRA court granted Frey's discovery request[, and the Commonwealth appealed].

*Frey*, 41 A.3d at 608-09 (footnotes omitted). The panel affirmed the PCRA court's order, and remanded for discovery related to Frey's PCRA claims. *Id.* at 614.[2] The Commonwealth filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which the Court denied on April 11, 2013. *See Commonwealth v. Frey*, 65 A.3d 413 (Pa. 2013) (*per curiam*).

Following discovery, Frey filed a second supplement to his PCRA petition. Once more, Frey argued, among other things, that the murders of Farmer and Johnson, both of which were committed near Farmer's home within approximately thirty-two days of each other, were connected. Frey maintained that the connections between the murders strongly suggested that they were committed by the same man, but that the man could not have been Frey, because Frey was incarcerated at the time of Farmer's murder. Notably, a man named John Ruth had been arrested and charged with Farmer's death. Apparently, Ruth and Johnson were rivals in the drug trade, which Frey argued was Ruth's motive to kill Johnson. Frey contended that Ruth killed both Farmer and Johnson. Subsequently, however, the

---

[2] Notably, the panel also determined that Frey's second PCRA petition, and its supplements, were timely pursuant to the after-discovered fact exception to the PCRA's one-year time bar. *See Frey*, 41 A.3d at 610-11 (citing 42 Pa.C.S. § 9545(b)(1)(ii)).

Commonwealth released Ruth from custody, and withdrew the murder charges against him.

On July 31, 2014, the PCRA court held a hearing. On December 31, 2014, the PCRA court entered an order denying Frey's PCRA petition. On January 21, 2015, Frey filed a timely notice of appeal. In response, the PCRA court directed Frey to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On February 11, 2015, Frey timely filed a concise statement. Finally, on March 18, 2015, the PCRA court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Frey raises a single issue for our review: "Whether the PCRA court erred in denying [Frey's] PCRA petition where [after-]discovered exculpatory evidence required a new trial?" Brief for Frey at 4. Our standard of review in PCRA cases is well-settled. We review the PCRA court's findings of fact to determine whether they are supported by the record, and we review its conclusions of law to determine whether they are free from legal error. *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014). The scope of our review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. *Id.*

The crux of Frey's appeal is that the litany of evidence that he discovered after his judgment of sentence became final constituted after-discovered evidence under the PCRA, and entitled him to a new trial. Frey divides the new evidence into three overarching categories: (1) "evidence

- 6 -

showing [that Frey] did not confess to killing the victim and putting his body in the Susquehanna River (namely the body itself, discovered on a mountain five years post-conviction);" (2) "evidence that John Ruth killed the second victim (Farmer);" and (3) "evidence that the same killer (not Frey) also killed the first victim."  Brief for Frey at 10.  We consider each of these categories in turn, and conclude that Frey has not demonstrated that he is entitled to a new trial.  However, we begin by reciting the elements that a PCRA petitioner must satisfy in order to demonstrate that after-discovered evidence warrants a new trial.

Pursuant to the PCRA, an appellant may be eligible for relief based upon after-discovered evidence only if he pleads and proves that his conviction or sentence was the result of "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced."  42 Pa.C.S. § 9543(a)(2)(vi).  Thus, as our Supreme Court has explained, to obtain relief based upon subsection 9543(a)(2)(vi), an appellant must establish that:  (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.  ***See Commonwealth v. D'Amato***, 856 A.2d 806, 823 (Pa. 2004); ***Commonwealth v. Abu–Jamal***, 720 A.2d 79, 94 (Pa. 1998).  "The test is conjunctive; the defendant must show by a preponderance of the evidence

- 7 -

that each of these factors has been met in order for a new trial to be warranted." **Commonwealth v. Padillas**, 997 A.2d 356, 363 (Pa. Super. 2010).

We begin with Frey's first category of after-discovered evidence: the discovery of the first victim's body. At trial, the Commonwealth presented evidence of Frey's confession to the police. In that confession, he admitted to killing Johnson, and told the police that he had deposited the body in the Susquehanna River. Years later, Johnson's body was found at the base of a mountain, and not in the Susquehanna River, as Frey had stated. Frey now maintains that the location of the body constitutes after-discovered evidence that satisfies all four prongs of the above-stated test.

Frey relies most heavily upon the contention that the discovery of the body in a different location constitutes exculpatory information. He points to the fact that, at trial, the prosecutor repeatedly told the jury that the body was unavailable for trial because Frey had destroyed it by depositing it in the river. Frey argues that "[a]t a minimum, the discovery of the victim's body robs the Commonwealth of [] Frey's confession and inculpatory statements made by witnesses that [] Frey put the body in the Susquehanna River at the location [where] he enjoyed fishing." Brief for Frey at 13. Frey further argues that the discrepancy between where the body eventually was located and his confession essentially nullifies the confession, and, without that piece of evidence, the evidence would not be overwhelming, as the trial court determined. **Id.** at 14.

- 8 -

Frey' argument fails for a number of reasons. First, Frey has not made a comprehensive argument that the discovery of Johnson's body satisfies all four prongs of the after-discovered evidence test. As noted, Frey must argue and prove **all** four elements. ***See Padillas***, *supra*. Frey focuses upon only the final element, that the evidence likely would compel a different verdict. He does not touch upon the first three prongs. For that reason, he has not demonstrated that he is entitled to relief. ***Id.***

Frey's claim also fails because he cannot satisfy the third prong of the test, that the evidence would not be used upon retrial solely for the purposes of impeaching credibility. If we assume that Frey did tell the police that he placed Johnson's body in the river,[3] the actual location where the body was found would be used solely to discredit his own confession. Notably, the evidence would not have eradicated the effect of his confession

---

[3]     We assume this fact for purposes of disposing of this argument. However, we note that the Commonwealth argues that the record does not support Frey's claim that placing Johnson's body in the river was part of his truthful confession. The Commonwealth cites the testimony of the police officer who obtained Frey's confession, which follows:

> We then got talking, and I knew [Frey] liked to fish, and I asked him about Green Branch at the Susquehanna River and I asked him if that's where the body was, and at that point he kind of agreed with me and said, and this is a quote, Yea, probably that's where it is but it's probably long gone by now. I wasn't sure if he was being truthful with me at that time because he kind of—because of his actions and reactions, and I just wasn't sure at that point in time.

Notes of Testimony ("N.T."), April 21-25, 2003, Vol. II, at 504.

in its entirety, just a portion of it. Again, the sole effect that the after-discovered evidence would have had would have been to discredit what he purportedly told the police in his confession, which is a use prohibited by the after-discovered test. *See D'Amato*, *supra*.

Finally, the evidence simply was not exculpatory. The actual location where the body was found does not, in any way, prove that Frey did not murder Johnson. Nor would it have negated definitively the portion of his statement to the police where he confessed to killing Johnson.

The evidence also would not have altered the outcome of the trial. In addition to the facts recited above, the record was replete with additional, inculpatory evidence. That evidence established the following events, which overwhelmingly demonstrate Frey's complicity in Johnson's murder. On May 26, 2002, Johnson left a friend's house to go for a motorcycle ride. Approximately one hour after he left, shots were fired from somewhere behind Farmer's house, which is where Johnson was storing his motorcycle. The police initially investigated a report of shots fired, and learned only that Frey's truck was seen in the driveway of Farmer's house around the time of the shots.

When Johnson did not appear for a family outing, Johnson's friend began filing missing persons reports. Approximately one week later, the police received an anonymous tip that someone had been murdered behind Farmer's residence. The police found shotgun wads in a wooded area behind Farmer's home. The police also found Johnson's motorcycle. It was buried

underneath pallets and a tarp approximately sixty feet from where Frey worked. The motorcycle had shotgun pellets embedded in various parts of the bike. The pellets were consistent with the wads found behind Farmer's residence, and with shotgun shells that were found in Frey's vehicle and residence.

At trial, various witnesses testified that Frey frequently purchased drugs from Johnson, and that Frey believed that Johnson had been overcharging him. One witness, David Holloway, testified that Frey admitted to him that he wanted to kill Johnson because Frey believed that Johnson had swindled him during drug purchases. Holloway testified that Frey stated that he intended to "get a shotgun and start taking mother fuckers out." N.T., Vol. I, at 156. Another witness, Chad Snyder, testified that Frey said, "I'd like to kill [Johnson]," *id.* at 195, after one incident in which Johnson would not sell drugs to Frey on the street. Frey also told Snyder that he had a shotgun behind the seat of his truck, and that he was going to shoot Johnson with that particular gun. *Id.* at 196.

On the day of Johnson's murder, Farmer woke up his girlfriend, Holly Strausbaugh, and told her that Frey had murdered Johnson. Strausbaugh described Farmer as "all freaked out," while he explained that Frey had shot Johnson with a shotgun in the woods behind his house. *Id.* at 332-36. Frey returned to the house later that day looking for things that belonged to Johnson. Strausbaugh showed Frey to the basement, where Johnson had stored the motorcycle and his other items. Frey found a jacket, a shirt, and

a helmet that belonged to Johnson. Frey took those items and left. *Id.* at 338-40.

A few days after the murder, Frey, Farmer, and Strausbaugh got into Frey's truck, and drove to purchase crack cocaine. During the drive, Farmer asked Frey what he did with Johnson's body. Frey "freaked out, just started saying don't ever fucking ask me again what I did with it." *Id.* at 348-49. Frey then stated that "no one would ever know where it was." *Id.* at 349.

On June 18, 2002, police located Frey at his mother's home. When they arrived there, they called the residence. Frey's mother answered the phone and told the police that Frey was there, but that he was sleeping. The police asked her to wake him up. Frey picked up the phone and agreed to exit the residence and speak with them. When Frey left the house, the officers advised Frey of his constitutional rights, and patted him down for weapons. Frey was then placed into the police cruiser and transported to the police station.

At the station, Frey told the police that Johnson had been selling him crack cocaine, which had caused Frey to give Johnson over $13,000 and computer equipment for the drugs. Frey told the officers that Johnson always threatened him and tried to scare him. Initially, Frey denied killing Johnson. However, he eventually became fidgety and nervous. After more prodding by a police officer, Frey admitted that he killed Johnson. *Id.* at 502-03. Frey stated that Johnson entered Farmer's residence on the day in question and started pestering Frey about money. Frey became upset. He

left the house and went out back to the wooded area. Johnson followed him outside, and continued to berate Frey about money. Frey then shot him with the shotgun. Frey stated that he "shot him until he was dead." *Id.* at 503. Later, Frey's mother arrived at the police station. During an embrace between mother and son, Frey said to his mother "I did it, Mom, I killed him." *Id.* at 513.

The evidence was overwhelming. Frey had the motive and opportunity to kill Johnson. Frey expressed his desire to kill Johnson repeatedly, and then admitted to doing so both to the police and to his mother, among others. Frey gathered up the evidence of his crime and attempted to conceal it, which further evinces his guilt. He even burned the car that Johnson had been driving. The fact that the body was not exactly where he told the police (assuming that he did so) is just a minor piece of evidence among the substantial body of inculpatory evidence presented by the Commonwealth. The discovery of this piece of evidence would not compel a different verdict.

Frey's remaining two claims are premised upon Frey's contention that John Ruth killed Farmer. We consider them together. Frey argues that evidence discovered after his trial, such as statements from Farmer's parents that implicate Ruth, proves that the same person killed both Farmer and Johnson. Because Frey was incarcerated at the time of Farmer's death, he could not have killed Farmer, and, *ipso facto*, he could not have killed Johnson.

Frey offers the following pieces of after-discovered evidence to prove that Ruth killed Farmer, and that the two murders were connected in such a way that Ruth also must have killed Johnson:

- Farmer's father told the police that Ruth killed Farmer.

- Farmer's mother told the Commonwealth that: (1) after Johnson's death, Farmer was scared of and angry at Ruth; (2) Ruth frequently sat at Farmer's window while holding guns; (3) Ruth destroyed Farmer's house at a time when Ruth was living with Farmer; and (4) there was a possibility that Farmer did not commit suicide, which was initially believed to be a potential cause of Farmer's death.

- The Commonwealth knew, but did not inform Frey, that Farmer's death was classified as a homicide since 2002. Suicide was unlikely because no weapon was found near Farmer's body, and because there was a trail of blood one-quarter mile long that emanated from a vehicle in which Farmer was shot.

- An individual named Dana Underwood would testify that Farmer was afraid for his life between the time of the first murder and the time of his death, which included a period of time when Frey was incarcerated. Other witnesses would have testified that Farmer was afraid for his life during that period and did not want to return to his home on the night that he was murdered.

- These witnesses were known to the Commonwealth, but not to Frey.

- Raymond Burd would have testified that Ruth would have killed anyone who interfered with his drug business. Burd believed that Johnson was stealing Ruth's business.

- Another witness known to the Commonwealth, but not Frey, John Topper, provided two statements to the Commonwealth in which he stated that Johnson was "shorting" Ruth during crack cocaine drug deals.

- Ruth's phone records demonstrated that Ruth called both Johnson and Farmer shortly before they both were murdered.

Frey maintains that this evidence, considered individually and cumulatively, satisfies the after-discovered evidence test.[4] We disagree. Even if we assume, *arguendo*, that Frey can satisfy the first three elements of the test, he cannot satisfy the last element.

The evidence pertaining to how and why Farmer was murdered is not exculpatory by itself, and has little bearing on Johnson's murder. The

_____

[4] Frey goes to considerable length to demonstrate that the Commonwealth violated their duty do disclose much of the above-listed evidence pursuant to **Brady v. Maryland**, 373 U.S. 83 (1963). **See** Brief for Frey at 20-25. Frey did not raise a **Brady** claim in his Rule 1925(b) concise statement. It is well-settled that claims that are not raised in a concise statement are waived for purposes of appeal. **See Commonwealth v. Lord**, 719 A.2d 306, 309 (Pa. 1998). Hence, Frey's **Brady** arguments are waived.

evidence demonstrates that Farmer did not kill himself, but instead was murdered. It also proves that Ruth may have been the person who killed Farmer. None of that is relevant to Frey. Frey must prove that there was a concrete connection between the Farmer murder and the Johnson murder. The only evidence that he offers are statements from witnesses who would say that Ruth and Johnson were competing in the drug trade, and did not have amicable feeling for each other due to alleged misdealings, and the fact that Ruth called both Farmer and Johnson before they were killed. This evidence hardly amounts to meaningful proof either that Ruth killed Johnson, or that Ruth killed both men.

More importantly, these very tenuous allegations based upon after-discovered material cannot overcome the nearly insurmountable body of evidence presented by the Commonwealth, and recited in detail above, to prove that Frey killed Johnson. We find it unreasonable to believe that the jury would have disregarded the physical evidence, Frey's suspicious cover-up behavior, and his multitude of confessions, including to his own mother, and, instead, would have found him not-guilty based upon unsubstantiated phone calls and an alleged drug feud. Simply put, Frey has not convinced us that any of this after-discovered evidence would have compelled a different verdict. **See D'Amato**, *supra*.

We have reviewed the record, the claims, and the arguments by the parties. Having done so, and for the reasons explained in depth above, the

PCRA court's order was supported by the record, and was not an abuse of discretion. Frey has not demonstrated that he is entitled to a new trial.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2015